# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

**KERRY D. AUSTIN,**

Plaintiff,

v.

**UNION BOND & TRUST CO.; MORLEY CAPITAL MANAGEMENT; and PRINCIPAL LIFE INSURANCE CO.,**

Defendants.

Case No. 3:14-CV-00706 -ST

**FINDINGS AND RECOMMENDATION**

**STEWART, Magistrate Judge:**

## INTRODUCTION

Plaintiff, Kerry D. Austin ("Austin"), filed this action on April 29, 2014, on behalf of himself and others similarly situated, alleging that defendants, Union Bond & Trust Co. ("Union"), Morley Capital Management ("Morley"), and Principal Life Insurance Co. ("Principal Life"), violated the Employee Retirement Income Security Act ("ERISA"), 29 USC §§ 1104 and 1106.  As discussed in more detail below, Austin alleges claims for:  (1) breach of fiduciary duty in violation of 29 USC § 1132(a)(2) and (a)(3) against Union and Morley (First Claim) and against Principal Life (Second Claim); and (2) engaging in prohibited transactions against all three defendants in violation of 29 USC § 1106(a)-(b) (Third and Fourth Claims).

On June 23, 2014, defendants filed a Motion to Dismiss or, in the Alternative, Motion to Stay Count IV of the Complaint (docket #25).  Defendants subsequently withdrew their request to stay proceedings on the Fourth Claim.  Reply in Support of Motion to Dismiss (docket #33), p. 15).  Accordingly, they seek dismissal under FRCP 12(b)(6) of each of Austin's four claims for failure to state a claim.  For the reasons that follow, the motion should be granted with leave granted to Austin to replead portions of his claims against Union and Morley.

### STANDARDS

In order to state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  FRCP 8(a)(2).  To meet this standard and "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'"  *Ashcroft v. Iqbal*, 556 US 662, 678 (2009) (emphasis added), quoting *Bell Atl. Corp. v. Twombly*, 550 US 544, 570 (2007).  A plausible claim "does not require 'detailed factual allegations,'" but does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*  Labels and conclusions or a formulaic recitation of the elements of a claim will not do.  *Twombly*, 550 US at 555.

In evaluating a motion to dismiss, the court must normally accept the allegations of material fact as true and construe those allegations in the light most favorable to the non-moving party.  *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F3d 777, 783 (9th Cir 2012).  However, the court "need not accept as true conclusory allegations that are contradicted by documents referred to in the compliant."  *Tritz v. US Postal Serv.*, 721 F3d 1133, 1135 n1 (9th Cir 2013), *cert denied*, 134 S Ct 2692 (2014) (citation omitted).  In particular, the "incorporation by reference" doctrine allows the court to "'look beyond the pleadings without converting [a] Rule 12(b)(6) motion into one for summary judgment.'"  *Davis v. HSBC Bank Nevada, N.A.*, 691 F3d 1152, 1160 (9th Cir

2012), quoting *Van Buskirk v. Cable News Network, Inc.*, 284 F2d 977, 980 (9th Cir 2002).  The court may consider documents specifically referred to in the complaint when the authenticity of those documents is not questioned.  *Id*, citing *Knievel v. ESPN*, 393 F3d 1068, 1076 (9th Cir 2005).

The thrust of Austin's claims against Union and Morley are for breach of their fiduciary duties by imprudently entering into certain "Investment Contracts," including the "Principal SIC" issued by defendant Principal Life.  Complaint, ¶ 4.  In support of their motion, defendants have submitted a copy of the Principal SIC (Group Annuity Contract No. GA 6-19583 with Application and Amendment No. 1) (Ex. 1 (docket #25-1))[1] and the Fund Disclosure dated April 30, 2013 (Ex. 2 (docket #25-2)).  Because both the Principal SIC and the Fund Disclosure are specifically referenced in the Complaint and no party questions their authenticity, this court may consider them in evaluating defendants' motion.

<u>ALLEGATIONS AND TERMS OF PRINCIPAL SIC</u>

**I.  <u>The Fund & SVF</u>**

The Principal Stable Value Fund ("Fund") is a collective investment trust established in 1997.  Complaint, ¶ 21.  Only employer-sponsored, tax qualified defined contribution retirement plans are eligible to invest in the Fund.  *Id*.  The Fund invests approximately 90% of its assets in Stable Value Investment Contracts ("Investment Contracts").  *Id*, ¶ 22.  According to the Fund Disclosure, the Fund's purpose is to preserve capital and offer "relatively stable returns consistent with its low risk profile," as well as liquidity, in order to provide a safe source of income for current and future retirees.  *Id*, ¶ 1.

A stable value fund ("SVF") is similar to a traditional bond fund in that the underlying assets are a collection of fixed income instruments, *i.e.* bonds.  Ex. 2, pp. 4-5.  In a traditional

---

[1] All references to Exhibits 1 and 2 refer to the ECF page number.

bond fund, the change in the market value of the underlying assets is immediately reflected in the value of the fund, resulting in substantial swings in market value as interest rates change.  In contrast, an SVF is designed to minimize the impact of market fluctuations.  The value of an investment in an SVF is dependent upon the book value of the assets (the purchase price plus contractually specified annual increases in value), rather than the current market value, and individuals can withdraw from the SVF at book value, even if the market value is lower.  Operators of SVFs are able to offer book value withdrawals by obtaining insurance through a vehicle known as a "wrap contract" (or, as referred to in the Complaint, an "Investment Contract").  The wrap contract ensures that if all of the fund participants seek to withdraw their investment when the assets are insufficient to pay each participant the book value of his interest in the SVF, then the wrap provider will pay the difference.  As does an insurer, the issuer of a wrap contract receives payment of a fee for the risk that it assumes.

## II.  **The Parties**

Austin, who resides in Kansas, has been a participant in the Performance Contracting Group, Inc. ESOP/401(k) Plan ("Plan") and has directed that assets allocated to his account in the Plan be invested in the Fund.  *Id*, ¶ 16.  Union is the Fund's Trustee, and Morley is the Fund's Investment Advisor.  *Id*, ¶ 3; Ex. 2, p. 1.  In common parlance, Morley tells the Fund what to buy and sell, and Union executes those transactions for the Fund.

Defendants are all inter-related subsidiaries of Principal Financial Group, Inc. ("PFG").  Morley is an investment manager headquartered in Portland, Oregon, and a wholly owned subsidiary of Morley Financial Services, Inc., which is a wholly owned subsidiary of PFG.  Complaint, ¶ 19.  Union also is headquartered in Portland, Oregon, a subsidiary of Morley, and

an indirect wholly owned subsidiary of PFG. *Id*, ¶ 18. Principle Life, an insurance company headquartered in Iowa, is a wholly owned subsidiary of PFG. *Id*, ¶ 20.

## III. Fund's Investments and Performance

At the close of 2013, the Fund had total assets exceeding $4 billion, with the vast majority (approximately 90%) invested in Investment Contracts, including Guaranteed Investment Contracts ("GICs") and Synthetic Investment Contract ("SICs") which are financial products offered by insurance companies. *Id*, ¶¶ 2, 22. In a traditional GIC, investors pay money to the insurance company in exchange for a contract promising a specified return on the investment.[2] *Id*, ¶ 2. An SIC simulates the performance of a traditional GIC, but the investor instead owns the underlying assets, rather than the contract itself. Id. SICs use wrap contracts that enable investors to manage risk and place a specific value on these assets. *Id*. Wrap contracts provide that participants will receive the assets' "book value" (also referred to by the parties as the "Contract Value") even if the market falls. *Id*. As clarified at the hearing, the book value is determined, in part, based upon a "Crediting Rate" which is calculated by the issuer of the SIC. The Crediting Rate changes over time and eventually evens out the market value fluctuations with all gains and losses passed through to investors.

Union, as the Fund's Trustee, and Principal Life entered into the Principal SIC in the form of a Group Annuity Contract on March 19, 2013. Complaint, ¶ 31; Ex. 1. The Fund's investment was $250 million at the outset with an additional $150 million invested in October 2013, constituting 9.25% of the Fund's assets. Complaint, ¶¶ 4, 31.

Other Investment Contract providers to the Fund included Prudential, MetLife, TIAA-CREF Life, and New York Life. *Id*. The Investment Contracts provide for a "Crediting Rate"

---

[2] A GIC is a type of guaranteed benefit policy ("GBP"). Under ERISA, the assets underlying a GBP are not treated as plan assets and are not subject to ERISA's fiduciary or prohibited transaction rules. 29 USC § 1101(b)(2). Therefore, the issuer of a GIC may retain any earnings on the underlying investment.

which is calculated based in part of the performance of the underlying assets. *Id*, ¶ 5. Participants in retirement plans that invest in the Fund are "credited with returns based on the blended crediting rates of all the Investment Contracts." *Id*.

Austin contends that the issuers of the Investment Contracts in which the Fund has invested, including Principal Life with respect to the Principal SIC: (1) "retain[ed] the difference between the actual return on investment of the assets underlying the Investment Contracts and the crediting rate, known as the 'spread'" (*id*, ¶ 6); and (2) "have consistently lowered crediting rates and retained ever-larger spreads" (*id*), even during periods when investment returns have increased. By setting the crediting rates and retaining the spread, Austin alleges that the Investment Contracts both "allow their issuers to set their own compensation and to collect unreasonable and/or excessive fees" which "are not disclosed." *Id*, ¶ 9. As a result, the annual rate of return for the Principal SVF has declined over time with an "incredibly poor performance" that is worse than similar funds. *Id*, ¶¶ 8, 29-30. Additionally, Austin alleges that the decision by Union and Morley to invest in the Principal SIC in particular has "resulted in fees flowing back to their affiliate company, Principal Life." *Id*, ¶ 85.

## FINDINGS

### I. Clarification of Fundamental Issues

During the hearing on the motion, two misunderstandings came to light which both affect the breadth and determine the viability of several claims. Austin clarified his position regarding the scope of the types of Investment Contracts and issuers that form the basis of his claims. He also clarified how the issuers of the Investment Contracts (including Principal Life) are allegedly able to "retain the 'spread.'" Finally, Austin's claims against Principal Life can only be understood with reference to the method by which the Crediting Rate is determined under the

terms of the Principal SIC.  These three fundamental issues are addressed first in order to properly frame the issues in this case.

### A.  <u>All Investment Contracts and Issuers</u>

First, Austin clarified that although the Principal SIC is the only Investment Contract specifically discussed in the Complaint, and despite the fact that Principal Life is the only Investment Contract  issuer (SIC or otherwise) named as a defendant, he nonetheless intends to assert claims against Union and Morley based upon the selection of:  (1) all types of Investment Contracts, not just SICs; and (2) Investment Contracts issued by others, not just those issued by Principal Life.  As described below, the terms of the Principal SIC eliminate the claims against Principal Life and narrow the claims against Union and Morley (at least insofar as they relate to investment in the Principal SIC).  However, this court does not have the benefit of the terms of any other Investment Contracts in which Union and Morley invested Fund assets.  No other issuer is a named defendant and, without the terms of any other Investment Contract before it, this court must await further information as it relates to other Investment Contracts and their issuers.

### B.  <u>Principal Life's Control Over Fund Assets</u>

Second, the parties disagree whether Investment Contract issuers (including Principal Life) have control over, or a right to retain the earnings on, the assets which underlie the Investment Contracts.  This second disagreement is pivotal to every claim alleged against Principal Life.  Because the Complaint references the terms of the Principal SIC, those terms must be examined in light of Austin's allegations.

Austin alleges that Principal Life benefited itself at the expense of Fund investors by setting the crediting rates applicable to the Principal SIC artificially low and retaining the

"spread," defined as the "difference between the actual return on investment of the assets underlying the [Principal SIC] and the crediting rate." Complaint, ¶ 6. In that manner, Union and Morley, through the Principal SIC, allow Principal Life "to set [its] own compensation and to collect unreasonable and/or excessive fees." *Id*, ¶ 9. Throughout the Complaint, retention of the "spread" is characterized as the means by which Investment Contract issuers, including Principal Life, charge unreasonable, excessive, and undisclosed fees to Fund investors. *See id*, ¶ 11 ("Principal Life determines the Crediting Rate and thus determines the value of the Principal SIC to plans participating in the Fund; it also sets its own fees by determining the spread it will retain."); ¶ 28 (the "Fund in effect charges additional fees to Plan participants by investing in Investment Contracts that permit their issuers to retain unlimited spreads. . . . However, the Fund Disclosure does not state that Investment Contract issuers set their own compensation by determining the Crediting Rate, or that the difference between the performance of the assets underlying the Investment Contracts and the Crediting Rate is retained by the issuers.").

While not entirely evident from the Complaint or the parties' submissions, Austin clarified at the hearing that Principal Life retains the "spread" by exercising control over and the right to "retain" amounts earned on the Fund's assets over and above any amounts credited to the "Contract Value Record" (or book value) of those assets. He contends that Principal Life obtained this control when it funded the Principal SIC, pointing to the language in the Schedule of Terms directing Union to "allocate [$400 million] to the Segregated Portfolio." Ex. 1, p. 26. According to Austin, this "allocation" of the "Funding Amount" means that Union, the Fund's trustee, transferred control or ownership of the underlying assets to Principal Life. As a result,

he asserts that Principal Life then could retain the "spread" between the Crediting Rate calculated under the Principal SIC and the actual market performance of those assets.

This assertion, however, is directly contradicted by the express terms of the Principal SIC. Attached to the Principal Life Segregated Portfolio Group Annuity Contract issued to Union, as the "Contractholder" (Ex. 1, p. 26), is the "Schedule of Terms" which identifies the parties and terms applicable to the Fund. The parties include the "Plan" (defined as the "Plan(s) covered by this contract are the Plans participating in the Principal [SVF]"), the Fund, the Custodian (State Street Bank & Trust Company), and the Investment Manager (Morley). *Id.* With respect to the "Funding Amount," it states that: "you [Union] will allocate the following amounts to the Segregated Portfolio." The "Segregated Portfolio" is defined as "the portfolio of investments (including cash) held by the Custodian of the Segregated Portfolio established with regard to this contract and its guarantees and managed by the Investment Manager." *Id*, p. 13. The "Custodian" is defined as the "institution that holds the Segregated Portfolio" and is identified in the Schedule of Terms as State Street Bank & Trust Company, not Principal Life. *Id*, p. 10. Therefore, Union is directed to allocate specified amounts ($250 million plus $150 million on specified dates) of the portfolio of investments held by State Street Bank & Trust Company as the "Initial Funding Amount" to the "Segregated Portfolio" for a wrap contract covered by Principal Life. Principal Life does not own or hold any underlying assets. Instead, the assets are owned by the Fund and are allocated or segregated into portfolios covered by various wrap providers, such as Principal Life, to ensure book value withdrawals. In this context, the directive to "allocate" is not ambiguous. It clearly does not mean to transfer ownership.

Nothing in the Principal SIC indicates that Principal Life has any ability to control, obligate, invest, or otherwise deal with the assets comprising the Principal SIC's Segregated Portfolio, except to the extent that Union and Principal Life, pursuant to the Principal SIC, agree that the assets of the Segregated Portfolio will be managed by the Investment Manager (Morley), "in accordance with the Investment Guidelines" which are part and parcel of the Principal SIC. (*id*, p. 12). Instead, Principal Life, in exchange for an annual fee of 0.20% of the Contract Value Record (or book value) during the first two years (after which it may increase only with 90 days written notice), obligates itself to pay "the amount by which the Contract Value Record may exceed the Market Value Record at a time when a Contract Value Payment is due under [the Principal SIC]." *Id*, pp. 10, 27. As part of that obligation, Principal Life is responsible for maintaining the Contract Value Record (or book value) which is the "accounting record" used to "define and limit our payment obligation under this contract." *Id*, p. 10. That book value is calculated by Principal Life at least monthly by adding four figures, as follows:

> The Contract Value Record for the previous day, plus
>
> Any additional Funding Amount added to the Segregated Portfolio on that day, plus
>
> Any adjustments under Article II [relating to annuities] on that day, plus
>
> Interest credited and compounded daily at the rate which, when credited and compounded daily, will produce the effective annual interest rate equal to the Crediting Rate in effect on that day credited on an amount equal to the sum of the first three amounts described in this definition.

*Id*.

///

///

10 – FINDINGS AND RECOMMENDATION

The Principal SIC specifies that, when a Contract Value Payment is necessary, the "payment must be withdrawn from the Segregated Portfolio" and that amount will be "deducted from both the Contract Value Record and the Market Value Record on the date the Contract Value Payment is made." *Id*, p. 14.  Principal Life is obligated to "pay into the Segregated Portfolio an amount equal to the lesser of the amount of the Contract Value Payment that cannot be satisfied from the Segregated Portfolio or the amount by which the Contract Value record exceeds the Market Value Record at that time." *Id.*  In sum, the Principal SIC contains no terms giving Principal Life a right to "retain the spread," as alleged by Austin.

In addition, the Principal SIC includes terms indicating that Principal Life lacks the ability to control investments by, and benefit payments, transfers, and withdrawals from, the Segregated Portfolio.  Principal Life has the "right to audit" documents or information concerning the Segregated Portfolio, including benefit payments, transfers, or other withdrawals from the Segregated Portfolio.  *Id*, p. 24 (Section 15- Records and Reports).  However, Morley (the Investment Advisor) manages the Segregated Portfolio, subject to the "Investment Guidelines" established by Union and accepted by Principal Life.  *Id*, pp. 30-36.  Those Investment Guidelines require, among other thing, that "[c]ash flows from principal and interest payments on securities held in the portfolio will be reinvested in accordance with these Investment Guidelines unless otherwise noted herein."  *Id*, p. 33.

Union – not Principal Life – "may withdraw amounts from the Segregated Portfolio," and Morley – not Principal Life – "has the discretion to select the specific investments in the Segregated Portfolio to be liquidated or transferred." *Id*, Article II, Sections 2-3, p. 14.  In short, the terms of the Principal SIC simply do not support, but in fact contradict, the claim that Principal Life had (or has) control over or any right to the earnings on the $400 million in assets

which comprise the "Initial Funding Amount" which was allocated "to the Segregated Portfolio." Instead, those earnings are held by Union, as trustee for the Fund, until paid to participants as authorized by the terms of the Principal SIC.

Austin did not request additional time to engage in discovery and submit documents or other evidence which would support the assertion as to retention of the "spread" by Principal Life, nor did he request that defendants' motion be converted to one for summary judgment under FRCP 56. In the face of the contrary terms in the Principal SIC, this court is unable to accept the conclusory assertion that the Principal SIC allows Principal Life to control the assets in the Segregated Portfolio or retain any "spread" between the Contract Value (book value) and the Market Value of the underlying assets.

To the degree that the claims against Principal Life turn on the allegation that it retained the "spread" between the Contract Value (book value, determined in part by the Crediting Rate) and the Market Value (based on actual performance) of the assets in the Segregated Portfolio, those claims fail. Nothing in the Principal SIC indicates that Principal Life had a right to receive or retain any such "spread."

## C. Calculation of the Crediting Rate; Determination of the Fair Market Value

Finally, the Complaint alleges that the issuers of the Investment Contracts, including Principal Life, "set their own compensation by determining the Crediting Rate." Complaint, ¶ 28. In particular, the Second Claim alleges that Principal Life breached its duties of prudence and loyalty by "setting the Crediting Rate . . . artificially low." *Id*, ¶ 65. While the terms of no other Investment Contract are before this court, the terms of the Principal SIC are referenced in the Complaint and set forth in Exhibit 1. Those terms flatly refute the notion that Principal Life

has the ability to "set" the Crediting Rate, much less that it has unbridled "discretionary authority to change the Crediting Rate and retain the spread." *Id*, ¶ 64.

The Principal SIC defines the Crediting Rate as follows:

> **Crediting Rate** is the effective annual rate of interest credited to the Contract Value Record, using the equivalent daily rate. The initial Crediting Rate is specified in the Schedule, as is the formula for determining changes to the Crediting Rate. The Crediting Rate may be modified by [Prudential Life] as described in the Schedule.

Ex. 1, p. 10.

The Schedule of Terms then sets the initial Crediting Rate at 0.77% and calls for a monthly recalculation of the Crediting Rate based on a mathematical formula[3] which is, in turn, dependent upon five inputs: (1) Portfolio Yield (Y); (2) the Market Value Record (MV) less accrued Fees not yet paid; (3) Contract Value Record (CV); (4) Portfolio Duration (D); and (5) the annual Fee (F) (identified in the Schedule as 0.20%). *Id*, p. 26. Some of these inputs depend upon calculations which, in turn, are dependent upon the Fair Market Value of the assets underlying the Segregated Portfolio.

Austin contends that defendants have "discretion" in setting the Fair Market Value because it allows them to decide that certain methods for determining a value are unavailable or unreliable. Under the terms of the Principal SIC, the Fair Market Value is "determined by the Investment Manager for each investment in the Segregated Portfolio" as follows:

> [1] Fair Market Value will be determined using the price obtained from a third party unaffiliated service, the **Pricing Service**, retained by the Investment Manager and acceptable to [Principal Life]. [2] If a Pricing Service is not available or reliable for an investment, the Investment Manager shall request a price from the Custodian. [3] If a reliable price can not be obtained from the Pricing Service or the Custodian, such value will be determined by the Investment Manager after obtaining a reliable price quote. [4] If no such quote is available, the value will be determined by

---

[3]  $CR = (1+Y)*(MV/CV)^{(1/D)} - F - 1.$

> the Investment Manager in a manner that is consistent with the pricing of similar investments in other portfolios managed by the Investment Manager, based on accepted practices in the securities industry.

*Id*, p. 11.

The first two methods measures both require reliance on a third-party Pricing Service over which defendants plainly have no control.  Even assuming that any of the four methods allow for "discretion," an assumption defendants dispute, and were ever used, which is not alleged, they nevertheless do not place that discretion into the hands of Principal Life or Union. It is the Investment Manager (Morley), not Principal Life, who retains the Pricing Service, requests a price from the Custodian, obtains a price quote, or ultimately determines the Fair Market Value based on accepted practices in the securities industry.

Austin has pointed to no other factor in the Crediting Rate formula which involves "setting" a value and, in particular, has pointed to no factor in the Crediting Rate formula over which Principal Life has control.  Instead, once the Investment Manager determines the Fair Market Value, the other factors are calculated based on certain underlying objective variables, such as the "duration of each investment" ("Portfolio Duration") and the "annual Fee amount" ("Fees") which are defined by the contract.  *Id*, pp. 11, 13.

In sum, the terms of the Principal SIC directly refute the allegations that Principal Life "determines the Crediting Rate and thus determines the value of the Principal SIC to plans participating in the Fund" and "sets its own fees by determining the spread it will retain." Complaint, ¶ 11.  Principal Life certainly calculates the Crediting Rate (Ex. 1, p. 26), but does so pursuant to a set formula which involves no exercise of discretion on Principal Life's part that is evident in the terms of the Principal SIC.

///

14 – FINDINGS AND RECOMMENDATION

D. **Effect of Clarifications and Express Terms of the Principal SIC**

When viewed in light of Austin's clarifications and the express terms of the Principal SIC, the claims against Principal Life fail as a matter of law, and the claims against Union and Morley are narrowed considerably, as discussed below.

## II.  **Claims Against Principal Life**

A. **Second Claim**

The Second Claim alleges that Principal Life acted as a "fiduciary" exercising management and control over Plan assets because it had "discretionary authority to change the Crediting Rate and retain the spread."  Complaint, ¶ 64.  It further alleges that Principal Life breached its fiduciary duties under 29 USC § 1109(a) which provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through  use of assets of the plan by the fiduciary, and shall be subject to such other equitable and remedial relief as the court may deem appropriate, including removal of such fiduciary.

Specifically, the Second Claim alleges that Principal Life:  (1) set the Crediting Rate for its own benefit rather than for the benefit of Plan participants; and (2) set the Crediting Rate artificially low, including but not limited to reducing the rate even when the return on assets invested pursuant to the Principal SIC was growing.  Complaint, ¶ 65.

///

///

///

This claim fails initially because Principal Life is not a fiduciary under ERISA with respect to the Principal SIC.  For purposes of ERISA, a person is a "fiduciary" with respect to a plan:

> to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 USC § 1002(21)(A).

As discussed above, nothing in the Principal SIC indicates that Principal Life "exercises any discretionary authority or control respecting management of" the Plan, "disposition of its assets," or "administration of" the Plan, or that Principal Life "renders investment advice" with respect to Plan assets.  To the contrary, the Principal SIC places management of the Plan, including investment decisions, squarely in the hands of Union and Morley.  The Principal SIC specifies that Principal Life's role is limited to providing the payments described in the Principal SIC. Ex. 1, p. 23.  It also specifies that Principal Life is not a fiduciary and has "no obligation or duty under [the Principal SIC] or otherwise" to monitor the Investment Manager (Morley)  or "concern ourselves with the operation of the application of withdrawals from the Segregated Portfolio."  *Id*, pp. 23-24.  The Segregated Portfolio is held by the Custodian (State Street Bank and Trust) and managed by the Investment Manager (Morley).  Union, as the Contractholder of the Principal SIC (*id*, p. 5), acknowledges both that it is "an independent fiduciary responsible for investment decisions affecting the fund" and that Principal Life does not become a fiduciary under any Plan as the result of its issuance of or "exercise of any rights under [the Principal SIC]."  *Id*, p. 23.

To the contrary, by its very nature, the Principal SIC sets up an adverse relationship between the Fund and Principal Life.  The Principal SIC specifies that, when a Contract Value Payment is necessary, the "payment must be withdrawn from the Segregated Portfolio" (*i.e.* from the segregated portion of Fund assets to which the Principal SIC applies) and that amount will be "deducted from both the Contract Value Record and the Market Value Record on the date the Contract Value Payment is made."  *Id*, p. 14.  Principal Life is obligated to "pay into the Segregated Portfolio an amount equal to the lesser of the amount of the Contract Value Payment that cannot be satisfied from the Segregated Portfolio or the amount by which the Contract Value record exceeds the Market Value Record at that time."  *Id*.  In other words, if the book value exceeds the Market Value, then Principal Life must pay any resulting shortfall into the Segregated Portfolio.  That risk is reduced the closer that book value comes to the Market Value and may be eliminated if book value is less than Market Value.  Thus, Principal Life benefits from a lower book value through a lower Crediting Rate, contrary to the participants who benefit from a higher book value relative to Market Value.  In that regard, Principal Life clearly cannot act as a fiduciary.

The Principal SIC both sets Investment Guidelines which restrict the investment of the assets comprising the Segregated Fund (*id*, pp. 24-25) and specifies the manner in which both the Crediting Rate and the Fair Market Value (one of the factors which affects the Crediting Rate) must be calculated (*id*, pp. 11, 26).  The Investment Manager (Morley) must invest the assets of the Segregated Portfolio in accordance with the Investment Guidelines (*id*, pp. 30) and determines the Fair Market Value of the assets in the Segregated Portfolio (*id*, p. 11) which the Investment Manager then reports to Principal Life.  These provisions assure both Union (as Trustee of the Fund) and Principal Life that their risk under the Principal SIC will not unduly

increase by the unilateral action of the other.  Principal Life may terminate the Principal SIC for cause if Union changes the Custodian or Investment Manager without its prior approval or permits "anyone, other than the Investment Manager, to exercise discretion or control over the Segregated Portfolio."  *Id*, p. 18.  Similarly, Principal Life may terminate the Principal SIC if Union's representations become "materially untrue" (*id*), including its representation concerning investment of the assets in the Segregated Portfolio.  *Id*, p. 12 ("You represent that you have provided us with a fully executed and effective copy of the Investment Guidelines . . .  and will take appropriate action to assure that the Investment Manager operates the Segregated Portfolio in accordance with the Investment Guidelines.").

Even if Principal Life fits within the definition of an ERISA fiduciary, the Second Claim expressly ties Principal Life's breaches to its conduct in setting the Crediting Rate for its own benefit, namely by artificially setting low Crediting Rates and retaining the "spread" between the actual performance of the assets in the Segregated Portfolio and Contract Value Record (book value), which is dependent upon the Crediting Rate.  However, as discussed at length above, nothing in the terms of the Principal SIC supports the assertion that Principal Life "sets" the Crediting Rate or that it retains any "spread," much less controls or owns the underlying assets in the Segregated Portfolio.  The underlying assets in the Segregated Portfolio are held by State Street Bank and Trust, and "[p]rincipal and interest earned on the investments of the Segregated Portfolio will continue to be reinvested within the parameters of the Investment Guidelines unless they are used to make a Benefit Payment."  *id*, p. 28.  Principal Life's remuneration is limited to the fee it charges for its services and guarantees provided under the Principal SIC.

Accordingly, the Second Claim should be dismissed with prejudice.

///

B. **Third and Fourth Claims**

The Third and Fourth Claims allege that all three defendants engaged in prohibited

transactions in violation of 29 USC § 1106(a)-(b) which prohibit "a fiduciary with respect to a

plan" from "causing the plan to engage" in certain transactions with a "party in interest" and

from dealing "with the assets of the plan in his own interest or for his own account," "act . . . on

behalf of a party . . . whose interests are adverse to the interests of the plan," or "receive any

consideration for his own personal account from any party dealing with such plan in connection

with a transaction involving the assets of the plan."

As to Principal Life, the Third Claim alleges that it engaged in a prohibited transaction by

"retaining for itself an excessive portion of the spread between its investment earnings and the

Crediting Rate, on top of charging a direct fee for administering the Principal SIC."  Complaint,

¶ 76.  However, as discussed above, the terms of the Principal SIC refute the assertions that

Principal Life is a "fiduciary" with respect to the Plan and that it retains any "spread."  Thus, the

Third Claim should be dismissed against Principal Life with prejudice.

The Fourth Claim alleges that defendants dealt with Plan assets in the Fund in their own

interest or for their own account.  Complaint, ¶ 79.  Specifically, Principal Life allegedly "set the

Crediting Rate for its own benefit rather than the benefit of the Plans and participants, and set the

Rate artificially low, that is, reducing the Rate even when the return on assets invested pursuant

to the Principal SIC was growing."  As detailed above, the terms of the Principal SIC refute the

contention that Principal Life "set" the Crediting Rate.  Accordingly, the Fourth Claim should be

dismissed against Principal Life with prejudice.

///

///

### III.  Claims Against Union and Morley

#### A.  First Claim

The First Claim alleges that Union and Morley breached their fiduciary duties under

29 USC § 1104(a)(1) by:

> [1] imprudently selecting Investment Contracts for inclusion in the
> fund that permit their issuers to set the crediting rates and retain the
> spreads, driving down the return on these investments to the Fund
> and, consequently, the Plans; [2] permitting the Investment
> Contract issuers to charge fees on top of retaining the spreads; [3]
> charging investors in the Fund additional fees which, together with
> Fund Level Expenses, are excessive; [4] acting in their own
> interests or the interests of their affiliate companies by investing in
> the Principal SIC; and [5] marketing the Fund as a safe investment
> for retirement plans when in fact it is extremely expensive relative
> to its poor performance.

Complaint, ¶ 55.

Given Union's express identification by the Plan as a fiduciary and the allegation that

"Morley, under Union's supervision and control, manages the Fund's investment of Plan assets"

(*id*, ¶ 54), Union and Morley cannot obtain dismissal of this claim on the ground that they are not

fiduciaries.

However, to the extent that this claim is premised on Principal Life setting the Crediting

Rate and retaining the "spread," it fails for the reasons discussed above.  Similarly, to the extent

it alleges that Union and Morley allowed Principal Life to charge disclosed fees "on top of

retaining the spreads," it fails.  If no "spread" is retained, then it cannot be a breach of any

fiduciary duty to charge a disclosed fee.  Thus, the first two alleged breach of fiduciary duties

with respect to the Principal SIC should be dismissed with prejudice .

The fourth allegation is difficult to comprehend, namely that Union and Morley breached

their duties by "acting in in their own interests or the interests of affiliated companies by

*investing in* the Principal SIC."  *Id*, ¶ 55 (emphasis added).  Union, as the Fund's Trustee, did

enter into, or invest in, the Principal SIC with Principal Life, but Morley, as the Investment

Manager, clearly did not.  However, a bare allegation that a fiduciary entered into a transaction

with an affiliate is not sufficient to state a claim for breach loyalty.  "[T]here is no per se rule

under ERISA against fiduciaries having conflicting loyalties." *Kanawi v. Bechtel Corp.*, 590

F Supp2d 1213, 1223 (ND Cal 2008), citing *Friend v. Sanwa Bank Cal.*, 35 F3d 466, 469 (9th Cir

1994).  Instead, "in order to prove a violation of the duty of loyalty, the plaintiff must go further

and show 'actual disloyal conduct'" by acting imprudently towards the plan participants.  *Tibble

v. Edison Int'l*, 639 F Supp2d 1074, 1106 (CD Cal 2009) (citation omitted).  To the extent that

Union and Morley entered into a transaction that allowed Principal Life to keep the spread and

manipulate the Crediting Rate, the claim fails for the reasons discussed above.

With respect to the third breach of fiduciary duties based on charging excessive fees,

Austin alleges that "Union is paid an average annual fee of .08% of assets under investment in

the Fund for its services as Trustee" and that "Union pays Morley an annualized fee of .04% of

assets under investment in the Fund."  Complaint, ¶ 25.  In addition, Union charges numerous

"Fund-Level Expenses" which the "Fund Disclosure states . . . are 0.27%, but it elsewhere states

that Union pays an annual fee of 0.14-0.15% to each Sub-Advisor, and 0.22% to 0.25% to each

of the issuers of the Contracts."  *Id*, ¶ 26.  The Fund Disclosure also states that "all expenses –

including the Trustee-Advisor Fee, Fund-Level Expenses, and the Service Fee charged to plan

which have Principal Life provide administrative and recordkeeping services, -- total 0.87%."

*Id*, ¶ 27.  These allegations are consistent with the Fund Disclosure which contains a chart

breaking down the "annualized fees as a percentage of Fund assets as of 12/31/2012."  Ex. 2,

p. 23.  Those charts shows that the "Total Fund Level Expenses" are 0.27%, including the "Sub-

Adviser Fees."  *Id.*  When added to the 0.08% Trustee/Adviser Fee (Union/Morley) and 0.52%

Service Fee (Principal Life) for the "Classic" Share Class, the "Total Fund Operating Expenses" is 0.87%. *Id.* Although these fees are disclosed, the Complaint alleges that "the Fund in effect charges additional fees to Plan participants by investing in Investment Contracts that permit their issuers to retain unlimited spreads." Complaint, ¶ 28.

As discussed above, Principal Life, as the issuer of the Principal SIC, does not "retain unlimited spreads." Thus, the allegation regarding excessive fees can only be premised on disclosed fees. In response, defendants point out that Austin does not allege that any of these disclosed fees are out of line with market rates. Although Austin argued at the hearing that the fees are not proportional to the services provided, he makes no such allegation in the Complaint. A bare allegation that fees are excessive, without supporting factual allegations, fails to state a plausible claim. *See Hecker v. Deere & Co.*, 556 F3d 575, 586 (7th Cir 2009) ("The fact that it is possible that some other funds might have had even lower ratios [was] beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund."). In contrast, the cases cited by Austin alleged specific facts supporting the claim of excessive fees. *Krueger v. Ameriprise Fin'l, Inc.*, No. 11-cv-2781, 2012 WL 5873825, at *10-11 (D Minn Nov. 20, 2012) (some of the mutual funds charged two levels of fees; the fees were greater than other specifically-named comparable funds; the fiduciary selected a more expensive share class for some of the investments even though it qualified for a share class with lower fees; and the fiduciary was receiving kickbacks and other rewards for its administrative decisions about fees); *George v. Kraft Foods Global, Inc.*, 674 F Supp2d 1031, 1039, 1047-48 (ND Ill 2009) (one of the plan's service providers allegedly received not only a contractual per-participant fee, but also an undisclosed fee from one of the plan's investment options providers); *Santomenno v. Transamerica Life Ins. Co.*, No. 12-2782, 2013 WL 603901, at *10 (CD Cal Feb.

19, 2013) (the fiduciary charged fees in addition to those charged by the mutual funds without providing any services).

The fifth alleged breach of fiduciary duty by Union and Morley is "marketing the Fund "as a safe investment for retirement plans when in fact it is extremely expensive relative to its poor performance." Complaint, ¶ 55. The annual rate of return for the Fund has declined from 2.20% in 2010 to 1.79% in 2011 to 1.27% in 2012 and to 0.84% in 2013. Complaint, ¶ 8. In addition, a chart shows that in comparison with "Hueler Companies Stable Value Indices, an industry benchmark, . . . the Fund consistently provides substantially lower Crediting Rates than do similar funds." *Id*, ¶ 30. Nonetheless, Principal Life made annual profit of $90-160 million from investment contracts held by retirement plans. *Id*, ¶ 37.

However, a "safe" investment and a "well performing" investment are not necessarily the same. An investment may perform poorly because it is safer than more risky investments. As defendants point out, the Fund has had a positive rate of return since 2010 unlike a traditional bond fund. For example, in 2013 the Vanguard bond fund had a negative return of 2.25% while the Fund has a 0.84% positive return. This difference is consistent with the design of an SVF to preserve investor capital even when traditional bond funds have negative returns. Defendants also point out that the Hueler Index is self-reporting, that bond values go down when interest rates go up, and that a fund's performance differs depending on the maturity of the bonds. A claim may be based on poor performance compared to other funds, but only when supported by additional facts. *See Krueger*, 2012 WL 5873825 at *10-11. Absent specific factual allegations as to why the Fund was lower performing than other similar funds, other than setting the Crediting Rate and retaining the "spread," this fifth allegation fails to state a claim for breach of fiduciary duty.

Therefore, the Second Claim should be dismissed against Union and Morley, but with leave to replead additional facts to support the alleged breaches of fiduciary duty not based on Principal Life setting the Crediting Rate for its own benefit or retaining the spread.

### B.  Third Claim

As to Union and Morley, the Third Claim alleges that they engaged in prohibited transactions in violation of 29 USC § 1106(a) "by selling the Fund to the Plans and receiving more than reasonable compensation for the services provided."  Complaint, ¶ 76.  Austin's contention that Union and Morley received "more than reasonable compensation" is premised upon the assertion that they allow the issuers of Investment Contracts to charge disclosed fees plus "undisclosed" fees, consisting of the "spread."  *See id*, ¶¶ 10, 28.  As explained above, there is no support in the terms of the Principal SIC that Principal Life retains any such "spread."  The pleadings fail to allege any other facts to support their assertion of excessive compensation collected by Union and Morley.

The remaining violation of selling the Fund to the Plans may be premised on the allegation that the fund performed poorly as compared to similar funds.  However, as discussed above, this legal conclusion is not supported by sufficient factual allegations and should be dismissed as well with leave to replead.

### C.  Fourth Claim

The Fourth Claim alleges that Union and Morley engaged in prohibited transactions in violation of 29 USC § 1106(b) because they "opted to invest funds in the Principal SIC, resulting in fees flowing back to their affiliate company, Principal Life."  *Id*, ¶ 85.  Again, to the degree this claim is premised upon the idea that Principal Life retained the "spread," it is contradicted by the express terms of the Principal SIC.  Beyond that, the Fourth Claim does nothing more

than allege that Union and Morley caused the Fund to enter into the Principal SIC with an affiliated company.

Initially, defendants sought a stay as to this claim because Principal Life and three other insurers sought approval in May 2012 from the Department of Labor ("DOL") for due to an industry-wide exemption for arrangements in which the trustee of a SVF purchases Investment Contracts from an affiliated insurance company. Ex. 3. If the application is granted, the legal basis for the Fourth Claim will become moot. However, the current status of the request for an exemption is unknown and any prediction of whether and when the DOL will grant the request is speculative at best. Perhaps in recognition of that reality, defendants withdrew their request for a stay in their Reply and instead argued that the claim should be dismissed.

Because defendants did not seek a dismissal of the Fourth Claim until filing their Reply, Austin has not had an opportunity yet to respond. Therefore, the Fourth Claim should not be dismissed against Union and Morley, but should await further briefing on this self-dealing issue.

### D.  Possible Claims Against Investment Contract Issuers, Other than Principal Life

As explained above, Austin has clarified that he seeks to allege claims against Union and Morley not only for investing in the Principal SIC, but also for the selection of all types of Investment Contracts, including other SICs and GICs. The terms of those other Investment Contracts are not in the record, leaving open the possibility that some of them may allow the issuer to both set an applicable Crediting Rate and retain the "spread" between the Contract Value Record (set in part by the Crediting Rate) and the performance of the underlying assets. At this juncture, however, the most that can be said is that the terms of the Principal SIC do not allow retention by Principal Life of any such "spread."

///

## RECOMMENDATION

For the reasons stated above, defendants' Motion to Dismiss (docket #25) should be GRANTED as to: (1) all claims against defendant Principal Life Insurance Company (Second Claim in its entirety, and portions of the Third and Fourth Claims) with prejudice; and (2) those portions of the First, Third and Fourth Claims against Union and Morley as to setting the Crediting Rates and retaining the spread in the Principal SIC with prejudice; and (3) the remaining portions of the First, Third and Fourth Claims against Union and Morley without prejudice and with leave to replead.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due Monday, December 01, 2014. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED  November 10, 2014.

s/ Janice M. Stewart
_____
Janice M. Stewart
United States Magistrate Judge